IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

JOYCE SNYDER                                                                          PLAINTIFF

V.                                                    CIVIL ACTION NO. 1:19-CV-034-SA-DAS

L-3 COMMUNICATIONS VERTEX
AEROSPACE, LLC                                                                     DEFENDANT

ORDER AND MEMORANDUM OPINION

Joyce Snyder filed her Complaint [2] on November 30, 2017, alleging that she was subjected to sex discrimination and fired as a result of illegal retaliation in violation of Title VII of the Civil Rights Act. Presently before the Court is L-3 Communications Vertex Aerospace, LLC's Motion for Summary Judgment [38]. The issues are fully briefed and ripe for review.

*Factual and Procedural Background*

Joyce Snyder began working in the aircraft service industry in 1989 when she first served as a civilian contractor at the Air Force base in Beeville, Texas. She worked for Boeing from 1997 to 2003 and later worked for L-3 in Meridian, Mississippi. In 2012, the Plaintiff was hired by Dyncorp, an aircraft maintenance contractor at the Air Force base in Columbus, Mississippi. At Dyncorp, Snyder worked as an aircraft servicer and was responsible for launch and recovery of the aircraft and making minor repairs like changing tires. Seven months later, Dyncorp promoted Snyder to work as an aircraft mechanic on the T-38 flight line.

In 2013, the Defendant acquired the Air Force base aircraft service contract from Dyncorp and hired Snyder to continue working as an aircraft mechanic on the T-38 flight line. As a mechanic, Snyder was primarily responsible for conducting Basic Postflight Operation (BPO) inspections, which assessed the mechanical needs of each aircraft.

Snyder claims that she was subjected to sexual harassment in the workplace in 2014. She filed an EEOC charge against L-3 specifically alleging incidents of sexual harassment. The claim was eventually resolved during the EEOC phase, and Snyder resumed her duties as an aircraft mechanic at L-3.

After maintaining a discipline-free employment record since she began working with L-3, Snyder was decertified in 2015 after failing to complete a BPO inspection. Around April of 2015, as Snyder was conducting a BPO inspection, she claims that she received a call informing her that her mother passed away. Snyder signed off on the BPO inspection and left immediately. L-3 later become aware that Snyder did not complete the inspection. Consequently, L-3 decertified Snyder requiring her to obtain re-certification in order to remain working as an aircraft mechanic. Snyder obliged and was recertified after attending additional training.

On July 7, 2016, Snyder was suspended without pay for three days after a cooling towel was sucked into the engine's intake on a T-38 aircraft. According to Snyder, she approached the engine with a cooling towel and lanyard around her neck. Both items were sucked into the engine and caused mechanical harm to the aircraft's engine. After she was suspended, Snyder asked John Cadden, the T-38 branch manager, whether she could "step down" and work as an aircraft servicer instead. According to Snyder, Cadden informed her that because they needed mechanics, "stepping down" was not an option at that time.

On October 7, 2016, Snyder was issued a written reprimand for failing to notice an allegedly missing panel on the left forward fuselage during a BPO inspection. Snyder believes the reprimand was unwarranted because she remembers the panel being in place when she conducted the inspection. She also recalls that the aircraft was moved several times after she conducted her BPO inspection. Snyder claims that she informed Cadden and he responded, "it was no big deal"

and that "it would be pulled out of my training jacket within ninety days." Snyder claims that she only signed the reprimand with an understanding that it would be removed from her record within three months.

Snyder was terminated three months later on January 19, 2017 after she conducted a BPO with multiple discrepancies and Red X's. L-3 claims that Snyder had eighteen discrepancies in her BPO and of those discrepancies, four were Category 2, and one was Red X. A Red X discrepancy means that the aircraft must be grounded until it is fixed. Following the inspections by the quality control team, Snyder was issued a written reprimand because of inadequate results and was terminated, according to the termination letter, for poor performance and prior disciplinary issues. At a later termination meeting attended by Branch Manager John Cadden, Human Resource Representative Teresa Houke, and Deputy Program Manager William Harner, Snyder claims that she was not allowed to explain why she believed her termination was unwarranted. Clyde Jackson, Snyder's Union representative, requested a "Last Chance" letter for Snyder. According to Snyder, L-3 had previously issued "Last Chance" letters to two men who were fired a few months before her. Harner denied Jackson's request and Snyder was terminated. Snyder was allegedly replaced by Larry Barrage, a male.

Snyder originally filed her Complaint [2] against L-3 and her Union for alleged violations of Title VII and for failing to seek arbitration on her behalf for her grievances against L-3. This Court entered an Order [57][1] severing Snyder's claims against L-3 and the Union on November 13, 2018. Specific to L-3, Snyder claims that L-3 discriminated against her because of her sex and

---

[1] There are two cases filed within the Northern District of Mississippi associated with Snyder's claims against L-3 and her Union. Originally, her claims against both entities were under the same case number. *See* Civil Action Number: 1:17-CV-200-SA-DAS. Snyder's discrimination and retaliation claims against L-3, however, were severed from her claims against the Union by an Order entered in the original case. As a result, the Clerk created the instant case number specifically for Snyder's discrimination claims.

retaliated against her after she filed an EEOC charge for sexual harassment. L-3 filed its Motion for Summary Judgment [38] on November 14, 2019 seeking dismissal of all claims alleged in the Plaintiff's Complaint [2].

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little*, 37 F.3d at 1075.

*Analysis and Discussion*

L-3 argues that it is entitled to summary judgment for three reasons: (1) the Arbitrator, who adjudicated Snyder's claims against her Union, previously found that Snyder was terminated for good cause and great weight should be afforded to that determination; (2) Snyder's Title VII claim fails because she cannot establish a *prima facie* case of sex discrimination or prove that L-3's legitimate nondiscriminatory reason is pretextual; and (3) Snyder's retaliation claim fails because Snyder cannot establish a causal link between her protected activity and the adverse employment action.

      i.     *Arbitrator's Decision*

The Defendant argues that the Court should afford great weight to the Arbitrator's Decision [38-9] that Snyder was terminated for good cause. Snyder avers that because the sole decision before the Arbitrator was whether L-3 complied with the Collective Bargaining Agreement, the Arbitrator's decision is irrelevant to the dispute before this Court.

Before the Court addresses the appropriate weight to afford the Arbitrator's decision, additional context is needed. There was not an arbitration proceeding in the instant case. The arbitration hearing was conducted to resolve a dispute between Snyder and her Union which she claimed failed to pursue arbitration on her behalf in violation of the Collective Bargaining Agreement. This claim is associated with the original case number. *See* Civil Action No.: 1:17-CV-200-SA. The original case included both Snyder's claims against the Union and her claims against L-3. The Court entered an order in the original case severing her claims against the Union and L-3, thus birthing the new case associated with Civil Action No.: 1:19-CV-34-SA. L-3 argues that although the arbitration decision involved a dispute between L-3 and the Union, the Arbitrator's decision should be given substantial weight in the Court's determination.

The United States Supreme Court made clear in *Alexander v. Gardner-Denver Company* that "arbitral procedures, while well suited to the resolution of contractional disputes, makes arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII." 415 U.S. 36, 56, 94 S. Ct. 1011, 1023, 39 L. Ed. 2d 147 (1974). The Court reasoned that "the purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII," and thus "deferral to arbitral decisions would be inconsistent with that goal." *Id*. Because "arbitrators are tasked to effectuate the intent of the parties rather than the requirements of enacted legislation," federal courts "should consider the employee's claim de novo," and "the arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Id.* at 56-60.

As to the appropriateness of the weight given arbitral decisions, courts consider "the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators." *Id.* at 415 U.S. 36, n.21, 94 S. Ct. 1011. Specific to Title VII, the Court clarified that "the court may properly accord great weight where the arbitral's decision gives full consideration to an employee's Title VII rights." *Id*.[2]

---

[2] "We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. But courts should ever be mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum." *See Alexander*, 415 U.S. 36, n.21, 94 S. Ct. 1011.

There were three distinct issues before the Arbitrator in Snyder's dispute against the Union: whether the grievance was arbitrable, whether the Union complied with the ten-day rule for imposing the disciplinary action under the Collective Bargaining Agreement, and whether there was just cause for the termination of Snyder. *See* Arbitrator's Decision [38-9]. The only decision relevant to this case is the Arbitrator's decision that Snyder was terminated for good cause. In the Decision [38-9], the Arbitrator considered Snyder's disciplinary record, including the decertification, written reprimand, suspension and termination, and ultimately concluded that the termination was supported by Snyder's prior disciplinary record. The Arbitrator, however, did not cite to the Title VII rights afforded to the Plaintiff nor did the arbitrator utilize the *McDonnell Douglas* burden shifting analysis to resolve the dispute.[3] As such, the Court affords little to no weight to the Arbitrator's decision in determining whether the Defendant is entitled to summary judgment.

ii.     *Sex Discrimination*

L-3 argues that Snyder's Title VII sex discrimination claim fails because there are no genuine disputes of material fact as to whether she was subjected to intentional discrimination on the basis of her sex. In particular, L-3 argues that Snyder cannot establish a *prima facie* case for sex discrimination because she fails to prove she was treated less favorably than similarly situated male co-workers. L-3 adds that even if the Court finds that Snyder established a *prima facie* case, she cannot prove that its legitimate nondiscriminatory reason is pretextual.

Title VII of the Civil Rights Act of 1964 prohibits intentional discrimination in the workplace, specifically providing that:

> It shall be an unlawful employment practice for an employer to fail
> or refuse to hire or to discharge any individual, or otherwise to

---

[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

> discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). "The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975*)); see also University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). "The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004)

Courts utilize the following burden shifting analysis and order of proof enunciated by the Supreme Court in *McDonnell Douglas Corporation v. Green*:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima* facie case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S. Ct. 1817). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S. Ct. 295, 296, n. 2, 58 L. Ed. 2d 216 (1978).

a. *Prima Facie Case*

The plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *See Texas Dept. of Community Affairs*, 450 U.S. at 253, 101 S. Ct. at 1093. In order to establish a *prima facie* case of employment discrimination the plaintiff must establish the following: "(1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to adverse employment action; and (4) was replaced by someone outside the protected class or in disparate treatment cases, was treated less favorably than similarly situated employees." *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 513 (5th Cir. 2001); (*citing Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)). A *prima facie* case "raises an inference of discrimination only because [courts] presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Texas Dept. of Community Affairs*, 450 U.S. at 254, 101 S. Ct. at 1094. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Id.*

The parties do not dispute the first three elements. Snyder is a female and is therefore a member of a protected class.[4] Snyder is qualified: she has worked with aircrafts in several capacities since 1989 including an eight year tenure at Gruman Technical Service, a six year tenure at Boeing, and a five year tenure at Dyncorp/L-3. Snyder was also subjected to an adverse employment action when she was terminated on January 19, 2017.[5]

The parties dispute, however, whether the final element is satisfied. Snyder asserts that she was replaced by Larry Barrage, a male, thus demonstrating the fourth element of a *prima facie* case of discrimination. While L-3 does not dispute that Snyder was replaced by a male, it argues

---

[4] *See 42 U.S.C. § 2000e-2(a)(1)* explicitly listing "sex" as a protected class amongst race, color, religion, or national origin. L-3 does not dispute whether Snyder is a member of a protected class.
[5] The Fifth Circuit held in *Pegram v. Honeywell, Inc.*, that "it is beyond dispute that a termination constitutes an adverse employment action." 361 F.3d 272, 283 (5th Cir. 2004) (citing *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001)). L-3 does not dispute whether Snyder was subjected to an adverse employment action.

that merely establishing that she was replaced by someone outside her protected class is not sufficient. L-3 avers that in order to satisfy the fourth *prima facie* element of a Title VII disparate treatment case, Snyder must establish that she was treated less favorably than similarly situated male co-workers. Fifth Circuit precedent is not clear on how the fourth element is to be applied in the disparate treatment context. For example, in *Okoye*, a Title VII disparate treatment case, the Court stated that in disparate treatment cases, the plaintiff must establish that she "was replaced by someone outside [her] protected class or in disparate treatment cases, was treated less favorably than similarly situated employees." *See Okoye*, 245 F.3d at 513. But in *Byers v. Dallas Morning News, Inc.,* a Title VII disparate treatment case, the Fifth Circuit stated that a plaintiff must simply establish "that [s]he was replaced by someone outside of the protected group." 209 F.3d 419, 426 (5th Cir. 2000). Without clear binding authority on which test to apply, the Court, out of the abundance of caution, will apply both tests, being careful not to unduly heighten the *prima facie* burden.

As a threshold matter, the parties do not dispute that Snyder was replaced by a male, therefore warranting no further discussion as to that test. Regarding the alternative test, to show that she was treated less favorably than other similarly situated male employees, Snyder highlights her male co-workers' BPO inspection pass rates in comparison to her 46% pass rate. According to a report on BPO pass rates, Michael Shelton had a pass rate of 33% and Jimmy Smith had a pass rate of 27%.[6] Aside from the BPO results, Snyder also argues that when she was issued a written reprimand for having 18 discrepancies on a BPO, other male co-workers had more than 18 discrepancies. She testified in her deposition that Mitch Norris had 21 discrepancies on a BPO and Danny Galloway had 23-24 discrepancies on his BPOs. *See* Deposition of Plaintiff [41-1]. Snyder

---

[6] These percentages were calculated in a review of the mechanics' BPO inspections by L-3's Quality Control Unit. *See* Exhibit 15. [41-15].

contends that L-3's failure to terminate Shelton, Smith, Norris, and Galloway demonstrates that it treated her less favorably than her male co-workers.

The Court finds that Snyder has established sufficient facts making a *prima facie* showing that she was treated less favorably than male co-workers.[7] Therefore, the Court finds no genuine disputes of material fact as to whether Snyder established a *prima facie* case of sex discrimination.

### b. Legitimate Non-Discriminatory Reason

Once the inference of discrimination has been established by the plaintiff's demonstration of a *prima facie* case, the defendant has the burden of articulating some legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglass Corp.*, 411 U.S. 792, 802, 93 S. Ct. 1817. The defendant has a mere burden of production rather than a burden of persuasion. *See St Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 2748, 125 L. Ed. 2d 407 (1993). "This obligation arises both from the necessity of rebutting the inference of discrimination arising from the prima facie case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext." *Texas Dept. of Community Affairs*, 450 U.S. at 258, 101 S. Ct. at 1096; *citing EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 101 S. Ct. 817, 66 L.Ed.2d 762 (1981).

The Defendant argues that every adverse employment action is supported by a legitimate nondiscriminatory reason: Snyder was suspended without pay in 2016 for her failure to appropriately secure the towel around her neck which was sucked into the aircraft's engine, she was later issued a written reprimand after she allegedly failed to report a missing panel on the left

---

[7] The Court notes that a "*prima facie* showing is not the equivalent of a factual finding of discrimination, however. Rather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations. When the *prima facie* showing is understood in this manner, the employer must be allowed some latitude to introduce evidence which bears on [its] motive." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80, 98 S.Ct. 2945, 2951, 57 L. Ed. 2d 957 (1978).

forward fuselage during her September 27, 2016 BPO inspection, and her final BPO inspection revealed 18 discrepancies, four of which were category two discrepancies, and one created a Red X condition. The Defendant contends that the combination of each of these incidents led to the Plaintiff's termination on January 19, 2017. L-3 adds that Snyder's termination and prior disciplinary record is consistent with the progressive discipline policy in the Collective Bargaining Agreement between L-3 and the Union.

Based on the reasons set forth above, the Court finds no genuine disputes of material fact as to whether the Defendant articulated a legitimate, nondiscriminatory reason for Snyder's termination, specifically, that Snyder was terminated for poor performance.

### c. Pretext

The burden of production now shifts back to the Plaintiff to establish that L-3's legitimate, nondiscriminatory reason is pretextual. *See McDonnell Douglas*, 411 U.S. 792, 802, 93 S. Ct. 1817. "At this step of the *McDonnell Douglas* analysis, the [Title VII] plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015); *citing Squyres v. Heico Companies, L.L.C.*, 782 F.3d 224 (5th Cir. 2015) (internal quotations omitted). "A plaintiff may establish pretext 'by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence.'" *Id*.

Snyder asserts that out of 50 to 60 mechanics employed at L-3, only two were women. Both women filed EEOC sexual harassment charges and both women were ultimately terminated. In addition, Snyder contends that L-3's legitimate, nondiscriminatory reason is pretextual because there is clear evidence of L-3 offering more favorable treatment towards males with less favorable

BPO inspection results than Snyder. In other words, similarly situated men, according to Snyder, had worse results and were not terminated. Snyder asserts that while she was denied the ability to "step down", she is aware of a male mechanic, Mack Black, who was allowed to voluntarily step down to be an aircraft servicer at a time when he was in danger of being terminated. There were also three male employees, Jimmy Smith, Dennis Galloway, and Mitch Norris, who had multiple discrepancies in their BPO inspections who were not fired. According to Snyder's deposition testimony, Galloway had approximately 24 discrepancies, Norris had approximately 22 discrepancies, and Smith had more than 18 discrepancies compared to Snyder's 18 discrepancies. In addition, Michael Shelton, another male employee, passed one of three inspections compared to Snyder's six of thirteen. And despite offering two males, Jonathan Faulkner and Jonathan Baylous, who were fired prior to Snyder's termination a "last chance" letter, Snyder was denied a "last chance" letter after her Union representative requested one on her behalf. In essence, Snyder argues that other similarly situated men were treated more favorably by the Defendant. She contends that this fact proves that the Defendant's legitimate, nondiscriminatory reason is therefore pretextual.

While Snyder's male co-workers had worse pass rates than her, Snyder does not provide any additional facts to prove that her male employees were "similarly situated" for the purposes of proving pretext. "Similarly situated employees are employees who are treated more favorably in 'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly." *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 857 (S.D. Tex. 2010); *citing Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 n. 33 (W.D. Tex. 2007). "Similarly situated individuals must . . . fall outside the plaintiff's protective class." *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). Because the Plaintiff is arguing that the Defendant's legitimate, nondiscriminatory reason is pretextual

based on L-3's more favorable treatment of similarly situated co-workers, the Plaintiff must establish that her comparators are "nearly identical." *See id.*

Here, Snyder and her male co-workers all worked as aircraft mechanics. As such, they all shared similar employment responsibilities, including conducting BPO inspections to ensure the safety of the aircrafts. And as the Plaintiff correctly identified, when BPO inspection results were posted, several male co-workers had lower pass rates than Snyder. If the Court only considered and compared Snyder to the male co-workers based on the BPO inspection results, as Snyder has suggested the Court should, there would be a clear finding that the male co-workers are similarly situated and were treated more favorably. The glaring distinction here, however, is the additional disciplinary incidents on Snyder's employment record that L-3 argues justifies its termination of Snyder.

L-3 claims it adhered to the progressive discipline plan in Appendix B of the Collective Bargaining Agreement between L-3 and the Union which provides that "this Company utilizes the following forms of progressive discipline: documented verbal warnings, written reprimands, suspensions, and discharge." *See Collective Bargaining Agreement.*[8] In the Termination Letter, L-3 referenced Snyder's entire disciplinary record as a basis for her termination, not only her BPO inspection results. In addition to her BPO discrepancies, Snyder was required to undergo re-certification after failing to complete a BPO. She was also issued a written reprimand in October of 2016 and was suspended without pay in July of 2016. Following these incidents, Snyder was terminated in 2017 pursuant to the progressive discipline clause in the Collective Bargaining Agreement. L-3 writes in the termination letter, "due to the safety of flight issue . . . [and]

---

[8] The Collective Bargaining Agreement was referenced by the parties but not attached as an exhibit; however, the Collective Bargaining Agreement is attached in the original case prior to the Court's Order severing the cases filed in 1:17-CV-200-SA-DAS. This Agreement is attached as "Exhibit 1" to Docket #29 in the original case number.

unsatisfactory quality and quantity of work, the Company has made the decision to terminate your employment with L-3 Technologies." *See Termination Letter* [38-5].

While Snyder repeatedly highlighted the BPO discrepancies of her male co-workers, she has not offered any proof that her male co-worker's employment record is "nearly identical" to hers. Namely, she has not proven that her male co-workers were decertified, issued reprimands, or suspended prior to receiving their poor BPO results. There is also no deposition testimony indicating the same.[9] She has not gone beyond the pleadings to designate specific facts showing that there is a genuine dispute about whether her male co-workers are "similarly situated."

Snyder submits, alternatively, that assuming *arguendo* there was a legitimate non-discriminatory reason, a reasonable jury could still find that her gender was a motivating factor in L-3's decision to terminate her for the same reasons considered above. Snyder asserts a mixed-motive alternative theory as the Supreme Court has recognized in *Desert Palace, Inc. v. Costa*. 539 U.S. 90, 123 S.Ct. 2148, 156 L. Ed. 2d 84 (2003). "A mixed-motive case arises when an employment decision is based on a mixture of legitimate and illegitimate motives." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) The Fifth Circuit has permitted a "mixed motive alternative" as an alternative for pretext in Title VII cases. In *Rachid*, the Court recognized that:

> if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, or another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).

---

[9] To survive summary judgment, a Plaintiff cannot rest on mere allegations but must set forth by affidavit or other evidence the specific facts which will be taken as true for the purposes of summary judgment. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992).

376 F.3d at 312 (internal quotations omitted) (citations omitted). In support of her mixed-motive alternative argument, Snyder refers the Court to her pretext section. Snyder does not add any additional supporting evidence tending to create a genuine issue of material fact as to whether her sex was a motivating factor for the adverse employment action. For example, there is no evidence of comments made by L-3 employees expressing an animus towards female mechanics; nor is there evidence suggesting that L-3 failed to hire women because of their gender. *See Rachid*, 376 F.3d at 313 (finding sufficient evidence to support a mixed-motive alternative where there was evidence of discriminatory comments made to the plaintiff about their age in an ADEA case.). Snyder has not gone beyond her pleadings by providing any evidence that would lead a reasonable jury to believe L-3 considered her gender when they terminated her. Because Snyder's termination was the result of recertifications, written reprimands, and suspensions pursuant to the progressive discipline clause in the Collective Bargaining Agreement, and absent any other evidence exposing a discriminatory motive by L-3, Snyder has not established sufficient facts to create a genuine issue of material fact as to whether L-3 had an illegitimate motive in terminating Snyder.

The Court finds that while Snyder has established a *prima facie* case for sex discrimination, she has failed to expose genuine issues of material fact as to whether the Defendant's legitimate, nondiscriminatory reason is pretextual. Thus, summary judgment is granted as to the Plaintiff's Title VII sex discrimination claim.

*iii.* *Retaliation*

Snyder alleges in her Complaint [2] that L-3 fired her in retaliation of the EEOC charge for alleged sexual harassment in the workplace which she filed in 2014. L-3 argues that it is entitled to summary judgment on Snyder's retaliation claim because she has not pled a sufficient *prima facie* case of retaliation.

"The *McDonnell Douglas* burden-shifting framework applies to retaliation claims." *Mota v. Univ. of Texas Houston Health Science Center*, 261 F.3d 512, 519–20 (5th Cir. 2001); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S. Ct. 1817. As outlined above, the Plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. The burden of production then shifts to the Defendant to articulate some legitimate nondiscriminatory reason. The Plaintiff must then establish that the Defendant's legitimate nondiscriminatory reason(s) is pretextual. *See McDonnell Douglass*, 411 U.S. at 802.

    a. *Prima Facie Case*

"To establish a *prima facie* retaliation, the plaintiff must establish that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007). "If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

As to the first element, "an employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any matter in an investigation, proceedings, or hearing" under Title VII." *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996) (*citing* 42 U.S.C. § 2000e-3(a)). There is no dispute that Snyder satisfied this requirement: Snyder filed an EEOC charge on June 17, 2014. *See Thompson v. North American Stainless, LP*, 562 U.S. 170, 173, 131 S. Ct. 863, 867, 178 L. Ed. 2d 694 (2011) (finding that the filing of an EEOC charge is a protected activity under Title VII.).

As to the adverse employment action, the Plaintiff argued that while her termination is an adverse employment action, the Court should consider the previous disciplinary actions as part of L-3's retaliatory scheme. The Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (*citing Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006)). Snyder's termination certainly qualifies as an adverse employment action under binding precedent. To the extent that there is dispute over whether the recertification, written reprimand, or suspension qualifies as an adverse employment action, the Court believes that dispute is more appropriately related to the causation prong because the Plaintiff believes that these actions support her temporal proximity theory.[10] Thus, the Court finds that Snyder has satisfied this prong of her *prima facie* case notwithstanding her position regarding the recertification, written reprimand, and suspension.

Snyder must now establish a causal connection between the filing of her EEOC charge in 2014 and her termination in 2017. *See McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (finding that a plaintiff seeking to establish a *prima facie* case of retaliation must demonstrate a causal connection between her participation in an activity considered protected under Title VII and the employer's adverse employment decision.). To succeed, Snyder must "demonstrate that her protected activity was the but-for cause of the employer's adverse employment action rather than simply a motivating factor." *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013).

---

[10] In her brief, the Plaintiff avers that the Defendant disputes her argument that the Court should consider the recertification, written reprimand, and the suspension adverse employment actions. However, in its reply, L-3 asserts that the Plaintiff's *prima facie* case fails on causation, not on the adverse employment action requirement.

To determine the existence of a causal link, [courts] look to three factors: (1) the employee's past disciplinary record; (2) whether the employer followed a policy in penalizing the plaintiff; and (3) the temporal proximity between the plaintiff's protected activity and adverse employment action. *Schroeder v. Greater New Orleans Federal Credit Union*, 664 F.3d 1016, 1024 (5th Cir. 2011); *see, e.g., DeHart v. Baker Hughes Oilfield Operations, Inc*., 214 Fed.Appx. 437, 442 (5th Cir.2007) (*citing Nowlin v. Resolution Trust Corp*., 33 F.3d 498, 508 (5th Cir.1994)); *see also Smith v. Xerox Corp*., 371 Fed. Appx. 514, 520 (5th Cir. 2010) (noting that existence of a causal link is highly fact specific).

First, Snyder's past disciplinary record is not perfect. As the Plaintiff correctly identified, Snyder did not have any discipline on her record until 2015. But in 2015, she was decertified for failure to complete a BPO inspection. She was later issued a written reprimand and suspension after the cooling towel incident. And Snyder was ultimately fired, according to L-3, as a result of both her BPO inspection results and her prior disciplinary history.

Second, L-3 typically disciplines employees pursuant to a progressive discipline Plan in Appendix B of the Collective Bargaining Agreement between L-3 and the Union which provides that "this Company utilizes the following forms of progressive discipline: documented verbal warnings, written reprimands, suspensions, and discharge." *See Collective Bargaining Agreement*. Snyder argues that L-3 changed its typical policies and procedures in terminating her when she was only written up after her suspension, instead of being terminated pursuant to the progressive discipline plan. Snyder contends that this change in policy satisfies the Fifth Circuit's standard set forth in *Schroeder*. 664 F.3d at 1024. Beyond the assertion that she was not terminated earlier than the Collective Bargaining Agreement called for, Snyder does not offer any additional evidence as to why her delayed termination indicates a causal connection.

The Court also finds that Snyder's assertion is factually misleading. While she was issued a written reprimand after suspension, the written reprimand was issued in concert with her termination. The written reprimand was issued for her poor performance and was immediately followed by a termination letter which cited to her poor BPO performance and her previous disciplinary record. In the Court's view, L-3's issuance of a written reprimand before terminating Snyder does not constitute the type of deviation from a company discipline policy sufficient to satisfy the second causal link factor. The Court concludes that because L-3 adhered to a predetermined disciplinary policy, as seen in its Progressive Disciplinary Plan, Snyder's receipt of a written reprimand before her termination does not establish the causal connectivity contemplated by the Fifth Circuit in *Schroeder* . *See Dehart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007) (finding causal connection not satisfied where there was strong evidence that employer followed detailed policy in disciplining an employee).

Finally, while Snyder concedes that her ultimate termination is too remote to serve as proof of a causal link, she urges the Court to consider the disciplinary actions leading to her termination as an unlawful discriminatory "scheme". Specifically, Snyder asserts that the chronology of events leading up to her termination should also be considered to establish a causal link because of their temporal proximity to the adverse employment action. Stated differently, Snyder contends that the Court should consider all disciplinary actions, rather than solely the termination, in its analysis as to whether a causal link exists. To that end, the Fifth Circuit has recognized "a chronology of events" theory in First Amendment retaliation claims. *See Brady v. Houston Independent School District*. 113 F.3d 1419, 1424 (5th Cir. 1997) (*citing Woods v. Smith*, 60 F.3d 1161 (5th Cir. 1995)). However, Snyder has not cited, nor has the Court located a case where the Supreme Court or the Fifth Circuit has applied the "chronology of events" theory in a Title VII retaliation case.

Nevertheless, even if the "chronology of events" theory does apply, the first action which initiated this alleged scheme would have been the decertification in April of 2015, which occurred approximately nine months after Snyder filed her EEOC Charge in July of 2014, therefore creating a question as to whether nine months is proximate enough to create an inference of retaliation. "Temporal proximity is one indicia of a prima facie causal link." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). The Fifth Circuit has previously held that a "time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). Although the Fifth Circuit has previously held a four-month time lapse sufficient, the Plaintiff has not cited any authority where a time lapse of nine months has been deemed sufficient to satisfy the causation prong. In fact, the Fifth Circuit has, on multiple occasions, found a time lapse less than nine months insufficient to establish a causal link. *See Bell v. Bank of America*, 171 Fed. Appx. 442, 444 (5th Cir.2006) (unpublished) (seven-month lapse, by itself, did not demonstrate a causal link); *see also Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir.2002) (finding that a five-month lapse, by itself, did not create a causal link between the protected activity and adverse employment action). Because Snyder's decertification happened more than four months after she filed her EEOC charge, temporal proximity is not a sufficient basis to establish a causal connection.[11] In

---

[11] Snyder's subsequent written reprimand, suspensions, and termination occurred more than 9 months and as logic demands would not serve as a sufficient basis to establish a causal connection because they exceed the four month limit articulated by the Fifth Circuit.

addition, the Court strains to identify any connectivity, beyond temporal proximity, between the adverse employment action and the protected activity that would satisfy the last prong.

Even viewing the facts in the light most favorable to Snyder, there are no genuine issues of material fact as to whether her protected activity is linked to L-3's adverse employment action. Because there are not sufficient facts to establish the three factors discussed, the Court finds that no reasonable jury could find that Snyder was retaliated against as a result of after her EEOC charge which was filed in 2014.

*Conclusion*

For all the reasons discussed above, the Defendant's Motion for Summary Judgment [38] is GRANTED. The Plaintiff's claims against L-3 are DISMISSED *with prejudice*. This case is CLOSED.

SO ORDERED this, the 21st day of February, 2020.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE